**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| HANMI FINANCIAL CORPORATION,<br><br>    Plaintiff,<br><br>vs.<br><br>SWNB BANCORP, INC., DORIS CHEN, MICHAEL HONG, TED K. C. HSIEH, SAM HWONG, CHAO-KUAN LEE, CHEN-HORNG LEE, JODY LEE, EDWIN MALMGREN, GARY OWENS, HASMUKH PATEL, MOHAMMED YOUNUS, AND SEAN HOU AS TRUSTEE OF THE HOU'S FAMILY IRREVOCABLE TRUST,<br><br>    Defendants. | Civil Action No. |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Hanmi Financial Corporation ("Hanmi" or "Plaintiff") files this complaint against Defendants SWNB Bancorp, Inc. ("SWNB"), Doris Chen, Michael Hong, Ted K. C. Hsieh, Sam Hwong, Chao-Kuan Lee, Chen-Horng Lee, Jody Lee, Edwin Malmgren, Gary Owens, Hasmukh Patel, Mohammed Younus, and Sean Hou as Trustee of the Hou's Family Irrevocable Trust (the "Director Defendants") (collectively "Defendants"), and alleges as follows:

**Nature of the Action**

1.      On May 18, 2018, Hanmi and SWNB executed an Agreement and Plan of Merger (the "Merger Agreement").  Under the Merger Agreement, SWNB was to merge with and into Hanmi with Hanmi being the surviving corporation (the "Merger").  The Merger Agreement required SWNB to use "all reasonable best efforts" to do or cause to be done all things necessary to consummate the transaction including by way of its Board of Directors recommending approval of the Merger Agreement to SWNB's stockholders.

2.      Despite Hanmi fulfilling every obligation imposed upon it under the Merger Agreement and at all times standing ready, willing and able to consummate the transaction, SWNB completely disregarded its obligations under the agreement as its Board of Directors orchestrated a scheme to ensure that the deal did not survive a vote of the SWNB stockholders.  SWNB then attempted to sanitize the conduct of its Directors by manufacturing a false excuse for failing to complete the Merger.

3.      Through the Merger, Hanmi sought to expand and improve the banking services available to members of the communities served by SWNB.  The SWNB Board of Directors' recommendation that the Merger Agreement be approved was important not only to encourage stockholder approval but also to generate community support by sending a positive message to SWNB's existing and potential customers that the Merger would be in their best interests.

4.      Notwithstanding Hanmi's full compliance with the Merger Agreement as well as its ability to complete the Merger, SWNB's Board of Directors first sought to renegotiate the terms of the Merger and then surreptitiously fought to terminate the Merger, including by actively advising stockholders to vote against the deal.  Ultimately, due to SWNB's repudiation of its contractual obligations and its efforts to avoid consummation of the Merger, SWNB's stockholders failed to approve the Merger.

5.      SWNB breached the Merger Agreement by, among other things, (1) SWNB's Board of Directors' recommendation that the stockholders vote against the Merger; (2) SWNB failing to use "all reasonable best efforts" to cause consummation of the Merger; (3) SWNB's Board of Directors actively advocating for SWNB's stockholders to vote against the Merger; and (4) SWNB replacing members of its leadership team while the Merger Agreement was in effect.

**Parties**

6.      Hanmi is a Delaware corporation with its principal place of business in Los Angeles, California.  Hanmi Bank is a wholly owned subsidiary of Hanmi Financial Corporation with 40 full-service branches and 9 loan production offices throughout the country.  Hanmi Bank specializes in serving multi-ethnic communities.

7.      Defendant SWNB Bancorp, Inc. is a Texas corporation with its principal place of business in Houston, Texas.  Southwestern National Bank is wholly owned by SWNB and has approximately 6 branches in Texas.  Southwestern National Bank specializes in serving the Chinese, Vietnamese, and Indian communities.

8.      Defendant Doris Chen is a director of SWNB and owns 527,748 shares of SWNB stock.  Upon information and belief, Ms. Chen is a resident of Sugar Land, Texas.

9.      Defendant Michael Hong is a director of SWNB and owns 562,665 shares of SWNB stock.  Upon information and belief, Mr. Hong is a resident of Houston, Texas.

10.     Defendant Ted K. C. Hsieh is a director of SWNB and owns 820,872 shares of SWNB stock.  Upon information and belief, Mr. Hsieh is a resident of Humble, Texas.

11.     Defendant Sam Hwong is a director of SWNB and owns 387,116 shares of SWNB stock.  Upon information and belief, Mr. Hwong is a resident of Houston, Texas.

12.     Defendant Chao-Kuan Lee is chairman of SWNB's board and owns 842,931 shares of SWNB stock.  Upon information and belief, Mr. Lee is a resident of Houston, Texas.

13.     Defendant Chen-Horng Lee is a director of SWNB and owns 1,023,341 shares of SWNB stock.  Upon information and belief, Mr. Lee is a resident of New Orleans, Louisiana.

14.     Defendant Jody Lee is a director of SWNB and owns 749,481 shares of SWNB stock.  Upon information and belief, Ms. Lee is a resident of Houston, Texas.

15. Defendant Edwin Malmgren is a director of SWNB and owns 767,092 shares of SWNB stock.  Upon information and belief, Mr. Malmgren is a resident of Spring, Texas.

16. Defendant Gary Owens is a director of SWNB, and the former CEO and President of SWNB.  Mr. Owens owns 175,216 shares of SWNB stock.  Upon information and belief, Mr. Owens is a resident of Fulshear, Texas.

17. Defendant Hasmukh Patel is a director of SWNB and owns 318,473 shares of SWNB stock.  Upon information and belief, Mr. Patel is a resident of Houston, Texas.

18. Defendant Mohammed Younus is a director of SWNB, former Dallas Regional President of SWNB, and current President of Southwestern National Bank.  Mr. Younus owns 25,000 shares of SWNB stock.  Upon information and belief, Mr. Younus is a resident of Richardson, Texas.

19. Defendant Sean Hou as Trustee of the Hou's Family Irrevocable Trust is a director of SWNB and owns 520,368 shares of SWNB stock.  Upon information and belief, the Hou's Family Irrevocable Trust's principal place of business is Houston, Texas.

## Jurisdiction and Venue

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  The parties are diverse in citizenship.  Plaintiff is a citizen of Delaware and California, and Defendants are citizens of Texas or Louisiana.  The amount in controversy exceeds $75,000, exclusive of interest and costs.

21. Defendants are subject to personal jurisdiction in this judicial district because Defendant SWNB's principal place of business is located at 6901 Corporate Drive, Houston, Texas 77036 and all Director Defendants, except Chen-Horng Lee, are domiciled in Texas.  Furthermore, venue is proper in this district pursuant to 28 U.S.C. § 1391 because (1) all Defendants, except Defendants Chen-Horng Lee and Mohammad Younus, reside in and around Houston, Texas, and (2) a substantial part of the events or omissions giving rise to the claims occurred in this district.

22.     Defendant Chen-Horng Lee is subject to personal jurisdiction in this district because he purposely availed himself of the benefits, privileges, and protections of the laws of Texas and reasonably anticipated being hailed into a Texas court by participating in the management of SWNB as a director and shareholder, and by taking actions in this district that resulted in the breaches of the agreements detailed below.

## Factual Background

### I.     The Merger Agreement.

23.     Hanmi and SWNB executed the Merger Agreement on May 18, 2018.  Pursuant to the Merger Agreement, SWNB was to merge with and into Hanmi with Hanmi as the surviving corporation.  In addition, Southwestern National Bank was to merge with Hanmi Bank with Hanmi Bank being the surviving entity.  The boards of both Hanmi *and SWNB* voted *unanimously* in favor of the Merger.  A true and correct copy of the Merger Agreement is attached hereto as Exhibit A.

24.     Pursuant to § 3.2 of the Merger Agreement, 80% of SWNB's common stock would be converted to Hanmi common stock, while the remaining SWNB stock would be exchanged for cash consideration.

25.     Section 4.19 of the Merger Agreement provides as follows:

> The Board of Directors of SWNB has determined that the Merger is fair to, and in the best interests of, SWNB and its stockholders, has approved and declared advisable this Agreement, the Merger, the Bank Merger and the other transactions contemplated hereby. . . [and] has resolved to recommend approval of this Agreement to the holders of SWNB Common Stock . . . .

26.     As confirmed in § 4.21 of the Merger Agreement, SWNB's Board received a Fairness Opinion from Sheshunoff & Co. Investment Banking, L.P. ("Sheshunoff") that recommended approval of the Merger. Section 4.21 states as follows:

> The Board of Directors of SWNB has received an opinion . . . from Sheshunoff to the effect that, subject to the terms, conditions,

> assumptions and qualifications set forth therein, as of the date hereof, the Merger Consideration to be received by the stockholders of SWNB pursuant to this Agreement is fair to such stockholders from a financial point of view. Such opinion has not been amended or rescinded as of the date of this Agreement.

27. In § 6.1.1 of the Merger Agreement, SWNB agreed to refrain from taking any action that would adversely impact the ability of the parties to consummate the Merger:

> During the period from the date of this Agreement to the Effective time, SWNB will . . . (v) voluntarily take no action that would: (x) materially adversely affect the ability of the parties to . . . consummate the Merger . . . or (y) materially adversely affect its ability to perform its covenants and agreements under this Agreement . . .

28. Pursuant to § 6.1.2(G) of the Merger Agreement, SWNB agreed not to hire or change its executive leadership while the Merger Agreement was in effect:

> Neither SWNB nor any SWNB Subsidiary shall hire or promote any employee to a rank having a title of vice president or other more senior rank or hire any new employee at an annual rate of compensation in excess of $50,000 . . . .

29. By way of § 6.1.2(BB) of the Merger Agreement, SWNB agreed not to "issue any broadly distributed communication of a general nature to customers without the prior approval of Hanmi."

30. Section 6.8 of the Merger Agreement expressly and unequivocally confirmed SWNB's agreement and obligation to take all reasonable efforts to consummate the Merger by stating as follows:

> Subject to the terms and conditions herein provided, SWNB agrees to use, and agrees to cause each SWNB Subsidiary to use, all reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under applicable laws and regulations to consummate the transactions contemplated by this Agreement.

31. Putting an even finer point on the obligation of SWNB to promote the Merger to its stockholders, § 8.1.1 of the Merger Agreement required SWNB's Board to affirmatively

recommend approval of the Merger to SWNB's stockholders, and use commercially reasonable efforts to obtain the stockholder vote necessary to approve the Merger. Section 8.1.1 states that:

> SWNB will . . . (ii) subject to Section 8.1.2, in connection with the solicitation of proxies with respect to the SWNB Stockholders Meeting, have its Board of Directors recommend approval of this Agreement to its stockholders; (iii) include such recommendation in the Proxy Statement-Prospectus; (iv) use commercially reasonable efforts to obtain from its stockholders a vote approving and adopting this Agreement . . . .

32. Pursuant to § 8.1.2 of the Merger Agreement, SWNB's Board could only withdraw its recommendation if it determined *in good faith* that its failure to do so would result in a breach of the Board's fiduciary duties:

> Notwithstanding anything in this Agreement to the contrary, at any time prior to the SWNB Stockholders Meeting, SWNB's Board of Directors may, if it concludes in good faith (after consultation with its outside legal advisors) that the failure to do so would cause it to violate its fiduciary duties under applicable law, withdraw, modify or change its recommendation that the stockholders of SWNB approve this Agreement in a manner adverse to Hanmi . . . .

33. Moreover, § 11.2 of the Merger Agreement states that:

> SWNB and Hanmi shall cooperate with each other in the development and distribution of all news releases and other public disclosures with respect to this Agreement, and except as may be otherwise required by law, neither SWNB nor Hanmi shall issue any news release, or other public announcement or communication with respect to this Agreement unless such news release or other public announcement or communication has been mutually agreed upon by the parties hereto . . . .

34. Section 10.1 of the Merger Agreement sets forth the circumstances under which either party may terminate the agreement including by mutual agreement of the parties (§ 10.1.1); upon a breach of any of the representations or warranties of the other party (provided the terminating party is not in breach) (§ 10.1.2); upon the failure to perform or comply with any of the covenants or agreements set forth in the Merger Agreement (§10.1.3); if the Merger is not closed by the

7

Termination Date or an agreed upon later date (§10.1.4); in the event of the failure of SWNB stockholders to approve the Merger Agreement (provided, in the case of termination by SWNB, SWNB has complied with its obligations under § 8.1.1) (§ 10.1.5); and, by Hanmi if SWNB shall have breached its obligations under § 6.10 or § 8.1 (§ 10.1.7).

35.     In the event that the Merger Agreement is terminated pursuant to any provision of § 10.1 of the agreement, § 10.2.2 of the Merger Agreement provides, in pertinent part as follows:

> If this Agreement is terminated, expenses and damages of the parties hereto shall be determined as follows:
>
> (B) If this Agreement is terminated because of a willful and material breach of any representation, warranty, covenant or agreement contained in this Agreement, the breaching party shall remain liable for any and all damages, costs and expenses sustained or incurred by the non-breaching party as a result thereof or in connection therewith or with respect to the enforcement of its right hereunder.
>
> (C) As a condition of Hanmi's willingness, and in order to induce Hanmi to enter into this Agreement, and to reimburse Hanmi for incurring the costs and expenses related to entering into this Agreement and consummating the transactions contemplated by this Agreement, SWNB hereby agrees to pay Hanmi and Hanmi shall be entitled to payment of, $3.12 million (the "**Termination Fee**") by wire transfer of same day funds on the earlier of (x) the date of termination or, if such date is not a Business Day, on the next following Business Day or (y) within three (3) Business Days after written demand for payment is made by Hanmi, as applicable, following the occurrence of any of the events set forth below:
>
> (i) . . . Hanmi terminates the Agreement pursuant to Section 10.1.7
> . . .

36.     According to § 11.9, the Merger Agreement is "governed by and construed in accordance with the laws of the State of Delaware."

37.     Pursuant to § 11.13 of the Merger Agreement, the parties thereto each "knowingly, voluntarily and intentionally" waived any right they may have to trial by jury in the event of any litigation arising out of the Merger Agreement.

## II. Voting Agreements

38. In addition to the Merger Agreement, the Director Defendants, including Defendant Sam Hwong, as stockholders of SWNB, executed a Voting Agreement whereby each individually agreed to vote his or her SWNB stock in favor of the merger. A true and correct copy of the SWNB Bancorp, Inc. Voting Agreement is attached hereto as Exhibit B.

39. Specifically, in Section 4 of the Voting Agreement each Director Defendant agreed to "be counted as present" at the stockholder meeting called for the purpose of approving the Merger and to vote "in favor of the approval of the Merger Agreement and the approval of all of the transactions contemplated thereby, including the Merger."

40. Section 4 also provides that if there were not enough votes to approve the Merger, each Director Defendant agreed to vote "in favor of any proposal to adjourn or postpone such meeting of SWNB's Stockholders to a later date" and that each agreed to vote against any action or proposal that would "prevent, impede, interfere with, delay, postpone, discourage or frustrate the purposes of or adversely affect the consummation of the transactions contemplated by the Merger Agreement."

41. Section 14 of the Voting Agreement provides that the parties thereto waive any right to trial by jury in the event of litigation directly or indirectly arising out of or relating to the Voting Agreement.

## III. SWNB's Board's Recommendation To Its Stockholders to Vote Against the Merger

42. In SWNB's July 12, 2018 Proxy Statement provided to SWNB stockholders, SWNB's Board stated that: "After careful consideration . . . the SWNB board of directors determined that the merger is in the best interests of SWNB and its stockholders and the consideration to be received in the merger is fair to the SWNB stockholders. Accordingly, the SWNB board of

directors unanimously approved the merger agreement and **recommended that the SWNB stockholders vote "FOR" the merger agreement.**"  [Emphasis added.]

43. Following the announcement of the Merger in May 2018, Hanmi's stock price rose from $28.05 per share on May 14 to a high of $30.90 per share on June 7, 2018.  Hanmi's stock price then declined.  On August 8, 2018, 8 days before SWNB's stockholders were scheduled to vote on the Merger, Hanmi's stock price was trading at $25.65.

44. Upon information and belief, Hanmi alleges that SWNB's Board, which collectively holds nearly a majority of SWNB's outstanding stock,[1] either sought an opportunity to extract more Merger consideration from Hanmi by throwing the Merger into doubt or simply experienced seller's remorse.  In either case, SWNB's Board thoroughly repudiated the Merger Agreement and its obligations thereunder.

45. Specifically, on August 8, 2018, mere days before SWNB's August 16 stockholder vote on the Merger, SWNB notified Hanmi that, "in order to fulfill [its] fiduciary obligations to" SWNB, SWNB's Board voted to change its recommendation to its stockholders regarding the Merger. Instead of recommending that SWNB's stockholders vote in favor the Merger, SWNB's Board reversed course and recommended that the stockholders vote against the Merger (the "Adverse Recommendation").

46. The only fact or circumstance SWNB cited for its change in position was the reduction in Hanmi's stock price which, at the time the SWNB Board voted for the Adverse Recommendation, would have resulted in an approximately 8% decline in the total merger consideration.

47. At no time did Sheshunoff rescind or modify its Fairness Opinion.

---

[1] The entire board of directors controls 48% of SWNB's outstanding shares.

48. The obviously manufactured, pretextual and false nature of the SWNB's Board's claim that it could not, consistent with its fiduciary duties, recommend approval is evidenced by the SWNB's Board previously informing SWNB's stockholders that it considered market fluctuations *prior* to executing the Merger Agreement and agreeing therein to recommend stockholder approval.

49. Indeed, SWNB's July 12, 2018 Proxy Statement provided to each SWNB stockholder, noted that:

> [t]he SWNB board of directors also considered potential risks and potentially negative factors concerning the merger in connection with its deliberations of the proposed transactions, including the following materials: . . . the fact that the merger consideration, which *consists primarily of shares of Hanmi common stock*, provides less certainty of value to SWNB stockholders compared to a transaction in which they would receive only cash consideration *[and that] the potential for a decline in the value of Hanmi common stock—whether before or after consummation of the merger—which would reduce the value of the consideration received by SWNB's stockholders*. [Emphasis added.]

50. SWNB's proxy statement also specifically identified the risk of Hanmi's stock declining by stating that "[b]ecause the market price of Hanmi common stock will fluctuate, SWNB stockholders cannot be certain of the market value of the merger consideration they will receive."

51. The more accurate basis for SWNB's conduct (as opposed to any legitimate concern for its fiduciary duties) became apparent when SWNB's Board stated it would not notify the stockholders of the Adverse Recommendation and would leave open the possibility that it would revert to its original recommendation if Hanmi increased Merger consideration.

### IV. Amendment To The Merger Agreement And Postponement of Initial Stockholder Meeting

52. On August 20, 2018, because Hanmi remained confident that the Merger was in the best interests of SWNB parties and the Texas communities in which Hanmi would continue and expand

SWNB's customer services, Hanmi agreed to amend the Merger Agreement (the "Amendment") to change the mix of Hanmi stock and cash SWNB would receive. A true and correct copy of the Amendment is attached hereto as Exhibit C.

53. Prior to the Amendment, SWNB was to receive 80% Hanmi stock and 20% cash. Pursuant to the Amendment, the allocation became 70% Hanmi stock and 30% cash.

54. On August 14, 2018, SWNB's Board voted to rescind the Adverse Recommendation. The parties further agreed to postpone the August 16 SWNB stockholder vote until August 28, 2018, to permit the stockholders time to analyze the change in the Merger Consideration mix.

55. Upon information and belief, SWNB director and stockholder Mr. Chen Lee was not present for the August 16 stockholder meeting.

56. Mr. Chen Lee holds approximately 1,023,341 shares of SWNB's stock. As a director and stockholder, Mr. Lee signed the Voting Agreement requiring him to be present at stockholder meetings regarding the Merger and to vote in favor of any proposal to adjourn or postpone the meeting if there were insufficient votes to approve the Merger Agreement.

**V.     The Second Stockholder Vote and SWNB's Renewed Efforts To Hinder the Merger**

57. Notwithstanding the Amendment, SWNB failed to abide by its contractual obligation to use "reasonable best efforts" to cause approval by SWNB's stockholders and consummation of the Merger.

58. For example, while Hanmi was preparing presentations to the stockholders advocating the benefits of the Merger, SWNB's Board refused to act in support of the Merger. In one call between Hanmi and SWNB, Jody Lee, the spokesperson for SWNB's Board, declared that SWNB would not reach out to its stockholders regarding the Merger. In fact, notwithstanding SWNB's

unambiguous obligations under the Merger Agreement, Ms. Lee stated that "it was not their job" to promote the Merger to SWNB's stockholders.

59. Making matters worse and compounding SWNB's ongoing breaches, Hanmi is informed and believes and, based thereon, alleges that members of SWNB's Board actively contacted SWNB's stockholders to hinder the vote and terminate the Merger. By way of example, upon further information and belief, SWNB's director and stockholder Sam Hwong contacted various SWNB stockholders seeking to persuade them to vote against the Merger.

60. Due to SWNB's passive and active failures to support the Merger as well as the affirmative actions of members of SWNB's Board designed to terminate the Merger, SWNB's stockholders voted against the Merger on August 28, 2018. Despite SWNB's board members controlling 48% of SWNB stock, only 56% of the outstanding stock voted in favor of the deal.[2]

### VI. SWNB's Replacement of Executive Officers

61. Having succeeded in backing out of the Merger and continuing with its duplicitous conduct, SWNB's Board elected to replace the company's leadership team including replacing its CEO and president, Gary Owens.

62. On or about September 12, 2018, SWNB announced that Gary Owens was being replaced as CEO and president of SWNB. George Lee was named as the new CEO and president of SWNB, while Mohammed Younus was named president of Southwestern National Bank. As of the time of this change in leadership, neither Hanmi nor SWNB had terminated the Merger Agreement pursuant to the provisions of its Article X.

63. Upon taking office, George Lee publicly announced the effective end of the Merger, claiming that the bank was "here to grow" on its own. In stark contrast to Hanmi's fulfillment of

---

[2] Merger approval required a 2/3 majority.

its contractual obligations and its good faith efforts to complete the Merger, Mr. Lee stated that the parties were "assessing their options," and added the shockingly and obviously untrue claim that the Merger failed because of "fundamental differences" between the two banks.

64. SWNB did not notify Hanmi regarding the change in SWNB's executive leadership or of the public announcement prior to the occurrence of either.

### VII. Termination by Hanmi

65. On September 26, 2018, Hanmi's Board of Directors unanimously approved termination of the Merger Agreement based upon SWNB's multiple and willful breaches of the Merger Agreement. On September 26, 2018, Hanmi provided written notice to SWNB of termination of the Merger (the "Termination Notice") as well as its demand for payment of its damages, costs and expenses incurred in connection with the Merger and the Termination Fee.

### Count I – Breach of the Merger Agreement

66. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as through the same were fully set forth herein.

67. The Merger Agreement is a valid and enforceable contract governing the relationship between Plaintiff Hanmi and Defendant SWNB.

68. Plaintiff performed each and every duty and obligation imposed upon it by the Merger Agreement and the related transaction documents.

69. Based upon the actions and inactions alleged hereinabove, SWNB committed multiple breaches of the Merger Agreement, including (but not exclusively) § 6.1.1; § 6.8; § 6.1.2(G); § 6.1.2(BB); and, § 11.2 of the Merger Agreement.

70. Pursuant to §§ 10.2.2(B) and 10.2.2(C) of the Merger Agreement, the Termination Notice demanded payment to Hanmi by SWNB of an amount equal to Hanmi's damages, costs and expenses sustained and incurred in connection with the Merger plus the Termination Fee.

71. Despite said demand and the passage of more than 3 Business Days following the Termination Notice, SWNB has failed and refused and continues to fail and refuse to make any payment to Hanmi.

72. Hanmi has engaged counsel to prosecute this action and is obligated to pay attorneys' fees and expenses for the enforcement of its rights under the Merger Agreement.

### Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing

73. Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as through the same were fully set forth herein.

74. The Voting Agreement is a valid and enforceable contract governing the relationship between Hanmi and Director Defendants.

75. Plaintiff performed each and every duty imposed upon it by the Voting Agreement.

76. The Voting Agreement included and imposed upon the parties the implied covenant of good faith and fair dealing barring them from taking any actions that would deprive either party of the benefits of the Voting Agreement.

77. The parties to the Voting Agreement understood that the purpose and fundamental premise of the Voting Agreement was to ensure SWNB's compliance with its obligation to use all best reasonable efforts to cause stockholder approval of the Merger Agreement and consummation of the Merger.

78. Recognizing that the Voting Agreement required the Director Defendants to vote in favor of the Merger yet wanting to terminate the Merger, the Director Defendants deceitfully implemented a plan to give the appearance of complying with the Voting Agreement by voting in favor of the Merger while at the same time persuading a sufficient number of non-director stockholders to vote against the Merger.  The scheme is reflected, in part, by some Director

Defendants voting in favor of the Merger while their close family members who are non-director stockholders voted against the Merger. By creating a pre-determined negative outcome of the stockholder vote, the Director Defendants rendered their votes hollow and ineffective thereby depriving Hanmi of the benefits of the Voting Agreements.

79.     Director Defendants at all times knew that their actions subverting and delaying the Merger vote by, among other things, approving the Adverse Recommendation, actively persuading non-director stockholders to reject the Merger, and preventing SWNB from using its reasonable efforts to consummate the Merger were taken in bad faith and therefore breached the Voting Agreement's implied covenant of good faith and fair dealing.

80.     Defendant Directors' breaches of the implied covenant of good faith and fair dealing caused damages to be suffered by Hanmi, including the incurrence of costs and expenses related to the Merger in an amount to be proven at trial.

## Prayer for Relief

WHEREFORE, Plaintiff Hanmi respectfully requests that this Honorable Court enter Judgment in favor of Plaintiff Hanmi Financial Corporation and against Defendant SWNB Bancorp, Inc. and Director Defendants for:

**Count I – Breach of the Merger Agreement**

a. All damages, costs and expenses sustained or incurred by Hanmi as a result of SWNB's breaches of the Merger Agreement all according to proof at the time of trial;

b. The sum of $3.12 million as and for the Termination Fee;

c. Interest on said sums as allowed by law;

d. All costs of enforcement of Hanmi's rights under the Merger Agreement including, without limitation, Hanmi's attorneys' fees and costs; and,

e. Such other and further relief as the Court may deem just and proper.

**Count II – Breach of the Implied Covenant of Good Faith and Fair Dealing**

a. All damages, costs and expenses sustained or incurred by Hanmi as a result of Director Defendants' breaches of the Voting Agreement's implied covenant of good faith and fair dealing all according to proof at the time of trial;

b. Interest on said sums as allowed by law; and,

c. Such other and further relief as the Court may deem just and proper.

                                      Respectfully submitted,

                                      **BLANK ROME LLP**

Dated: October 2, 2018               */s/ Barry Abrams*
                                           Barry Abrams
                                           Texas State Bar No. 00822700
                                           Southern District No. 2138
                                           babrams@blankrome.com
                                           717 Texas Avenue, Suite 1400
                                           Houston, TX 77002
                                           Tel: 713.228.6601
                                           Fax: 713.228.6605
                                           ATTORNEY-IN-CHARGE FOR PLAINTIFF
                                           HANMI FINANCIAL CORPORATION

OF COUNSEL
Gregory M. Bordo
*Pro Hac Vice Admission Pending in USDC SDTX*
California State Bar No. 156147
Tel: 424.239.3404
Email: gbordo@blankrome.com
Christopher J. Petersen
*Pro Hac Vice Admission Pending in USDC SDTX*
California State Bar No. 251439
Tel: 424.239.3464
Email: cjpetersen@blankrome.com
Craig N. Haring
*Pro Hac Vice Admission Pending in USDC SDTX*

California State Bar No. 314100
Tel: 302.425.6426
Email: charing@blankrome.com
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Fax No. 424.239.3434