**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HANMI FINANCIAL CORPORATION, Plaintiff, | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:18-3546 |
| SWNB BANCORP, INC., DORIS CHEN, MICHAEL HONG, TED K. C. HSIEH, SAM HWONG, CHAO-KUAN LEE, CHEN-HORNG LEE, JODY LEE, EDWIN MALMGREN, GARY OWENS, HASMUKH PATEL, MOHAMMED YOUNUS, and SEAN HOU as Trustee of the Hou's Family Irrevocable Trust, Defendants. | § § § § § § § § § § § | |

## MEMORANDUM AND ORDER

Before the Court in this failed-merger litigation is Defendants' Motion to Dismiss Plaintiff's Complaint ("Motion to Dismiss" or "Motion") [Doc. # 16]. Plaintiff filed a response,[1] and Defendants replied.[2] The Court held oral argument on the Motion,[3] and the Motion is ripe for decision. Based on the parties' briefing, arguments raised at the hearing, pertinent matters of record, and relevant legal authorities, the Court concludes the Motion to Dismiss should be **granted in part**

---

[1] Plaintiff's Response in Opposition to Defendants' Motion to Dismiss Plaintiff Hanmi's Complaint ("Response") [Doc. # 19].

[2] Reply Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff Hanmi's Complaint ("Reply") [Doc. # 22].

[3] *See* Hearing Minutes and Order dated January 11, 2019 [Doc. # 26].

**and denied in part**.  The Court retains Plaintiff's claim for alleged breach of the Merger Agreement and dismisses Plaintiff's claim for breach, under Delaware law, of the implied covenant of good faith and fair dealing.

# I.  <u>INTRODUCTION</u>

This lawsuit arises from a failed merger between Plaintiff Hanmi Financial Corporation ("Hanmi") and Defendant SWNB Bancorp, Inc. ("SWNB").  Failure of the merger provoked this suit by Hanmi against SWNB and all twelve members of SWNB's board of directors (the "Directors").  Hanmi claims SWNB breached several provisions of a merger agreement, which provisions were designed to facilitate consummation of the merger.  Hanmi also claims the twelve Directors breached the implied covenant of good faith and fair dealing with respect to their shareholder voting agreements, which agreements required the Director to vote his or her shares in favor of the merger.

Defendants move to dismiss Hanmi's claims under Federal Rule of Civil Procedure 12(b)(6).  SWNB contends the conduct alleged to comprise the contract violations were compelled by its board's fiduciary duties and were contractually permitted by a "fiduciary out" clause in the merger agreement.  The Directors assert that Hanmi's claim of breach of the implied covenant of good faith and fair dealing is not legally cognizable because their shareholder voting agreements leave no gaps for terms to be implied.

Defendants' Motion to Dismiss is **denied in part** and **granted in part**.  Hanmi's breach of contract claim survives because, under Hanmi's allegations, SWNB did not properly avail itself of its contractual "fiduciary out" clause.  Hanmi's claims against the Directors individually for breach of the implied covenant of good faith and fair dealing will be dismissed for reasons argued by the Directors.

P:\ORDERS\11-2018\3546MDism.docx  190226.1557

## II.   BACKGROUND

### A.   Hanmi and SWNB

Hanmi is a Delaware corporation with its principal place of business in Los Angeles.  Complaint [Doc. # 1], ¶ 6.[4]  Hanmi's wholly owned subsidiary, Hanmi Bank, specializes in serving multi-ethnic communities.  *Id.*  Hanmi Bank has 40 full-service branches and 9 loan offices throughout the country.  *Id.*

SWNB is a Texas corporation with its principal place of business in Houston.  *Id.* ¶ 7.  SWNB's wholly owned subsidiary, Southwestern National Bank, specializes in serving members of the Chinese, Vietnamese, and Indian communities in Texas.  *Id.*  SWNB's board of directors ("SWNB's Board") consists of twelve members,[5] all of whom are either Texas or Louisiana residents. *Id.* ¶¶ 8-19.  Each Director is an SWNB shareholder.  *Id.*  Collectively, the Directors own 48% of SWNB's outstanding shares.  *Id.* ¶ 44 n.1.

### B.   Hanmi and SWNB's Merger Agreement

On May 18, 2018, Hanmi and SWNB executed an Agreement and Plan of Merger ("Merger Agreement") [Doc. # 1-1].  Under the Merger Agreement, SWNB was to merge into Hanmi with Hanmi being the surviving corporation.  *Id.* § 2.1.  Once SWNB and Hanmi merged, Southwestern National Bank was to merge into Hanmi Bank with Hanmi Bank being the surviving entity.  Complaint ¶ 23.  The boards of directors of both Hanmi and SWNB voted unanimously in

---

[4]   This factual background is drawn from the allegations in Hanmi's Complaint [Doc. # 1], which, at this stage, must be taken as true, *see, e.g.*, *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009).

[5]   The Directors are Doris Chen, Michael Hong, Ted K. C. Hsieh, Sam Hwong, Chao-Kuan Lee, Chen-Horng Lee, Jody Lee, Edwin Malmgren, Gary Owens, Hasmukh Patel, Mohammed Younus, and Sean Hou as Trustee of the Hou's Family Irrevocable Trust.  Complaint ¶¶ 8-19.

favor of the Merger Agreement. *Id.* The merger would be consummated only by a vote of at least two-thirds of SWNB's outstanding shares. *Id.* ¶ 60 n.2.

As consideration for the merger, 80% of each SWNB shareholder's stock would be converted into Hanmi stock and the remaining 20% of SWNB shares converted into cash. Merger Agreement § 3.2.1. Sheshunoff & Co. Investment Banking, L.P. ("Sheshunoff") issued a fairness opinion, stating that the merger consideration was fair to SWNB's stockholders from a financial point of view. *Id.* § 4.21. SWNB's Board represented it had resolved to recommend approval of the Agreement to its shareholder as the merger was "fair to, and in the best interests of, SWNB and its stockholders." *Id.* § 4.19.

To facilitate SWNB stockholder approval, the Merger Agreement included several "deal protection devices," that is, clauses "intended to protect the consummation of a merger transaction." *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 933 (Del. 2003). One such device provides:

> During the period from the date of this Agreement to the Effective time, . . . SWNB will . . . (v) voluntarily take no action that would: (x) materially adversely affect the ability of the parties to . . . consummate the Merger . . . [, or] (y) materially adversely affect its ability to perform its covenants and agreements under this Agreement.

Merger Agreement § 6.1.1. Another deal protection device states:

> Subject to the terms and conditions herein provided, SWNB agrees to use, and agrees to cause each SWNB Subsidiary to use, all reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under applicable laws and regulations to consummate the transactions contemplated by this Agreement.

*Id.* § 6.8.

Another trio of deal protection devices requires SWNB to (1) "in connection with the solicitation of proxies with respect to the SWNB Stockholders Meeting, have its Board of Directors recommend approval of this Agreement to its stockholders"; (2) "use commercially reasonable efforts to obtain from its

4

stockholders a vote approving and adopting this Agreement"; and (3) "cooperate and consult with [Hanmi]" to obtain a stockholder vote approving the merger. *Id.* § 8.1.1(ii), (iv), (v).

Also included in the Merger Agreement is a "fiduciary out" clause, "which allows the target company's board of directors not to comply with some, or all, of the directors' obligations under the agreement if it is necessary for them to avoid a breach of fiduciary duties." *See* Julian Velasco, *Fiduciary Duties and Fiduciary Outs*, 21 GEO. MASON L. REV. 157, 157 (2013). This provision states in pertinent part:

> Notwithstanding anything in this Agreement to the contrary, at any time prior to the SWNB Stockholders Meeting, SWNB's Board of Directors may, if it concludes in good faith (after consultation with its outside legal advisors) that the failure to do so would cause it to violate its fiduciary duties under applicable law, withdraw, modify or change its recommendation that the stockholders of SWNB approve this Agreement in a manner adverse to Hanmi (a "Change of Recommendation"); provided that prior to any such Change of Recommendation, SWNB shall have complied in all material respects with Section 6.10[6], given Hanmi written notice promptly (and in any event within twenty-four (24) hours) advising it of the decision of SWNB's Board of Directors to take such action and, if the decision relates to an Acquisition Proposal, given Hanmi the material terms and conditions of the Acquisition Proposal or inquiry, including the identity of the person making any such Acquisition Proposal; . . . . Nothing contained in this Agreement shall prohibit SWNB from otherwise disclosing any information to its stockholders that the

---

[6] Section 6.10 of the Merger Agreement requires SWNB to, among other things, refrain from soliciting other merger offers, furnishing information to a potential competing bidder, engaging in negotiations regarding a competing offer, or accepting a competing offer. *See* Merger Agreement § 6.10. Section 6.10 contains its own "fiduciary out" clause, which, when properly invoked, releases SWNB from its obligations under Section 6.10. This clause is not implicated by Hanmi's claims.

> Board of Directors of SWNB determines in good faith (after consultation with its outside legal counsel) that it is required to disclose in order to not breach its fiduciary duties to SWNB's stockholders under applicable law, subject to compliance with the requirements of Section 8.1.2.

*Id.* § 8.1.2.

Section 10.1 sets forth the circumstances under which a party may terminate the Merger Agreement. The Merger Agreement may be terminated by: mutual agreement of the parties, *id.* § 10.1.1; breach of any of the representations or warranties of the other party, provided the terminating party is not in breach, *id.* § 10.1.2; failure to perform or comply with any of the covenants or agreements set forth in the Merger Agreement, *id.* § 10.1.3; failure of SWNB stockholders to approve the Merger Agreement, provided, in the case of termination by SWNB, SWNB has complied with its obligations under Section 8.1.1 (subject to Section 8.1.2), *id.* § 10.1.5; SWNB's breach of its "obligations under Section 6.10 or 8.1 (subject to Section 8.1.2)," *id.* § 10.1.7.

In the event that the Merger Agreement is terminated "because of a willful and material breach of any representation, warranty, covenant or agreement contained in this Agreement, the breaching party shall remain liable for any and all damages, costs and expenses, sustained or incurred by the non-breaching party as a result thereof or in connection therewith or with respect to the enforcement of its rights hereunder." *Id.* § 10.2.2(B). Moreover, SWNB agreed to pay Hanmi a $3.12 million termination fee if Hanmi terminates the Merger Agreement pursuant to Section 10.1.7. *Id.* § 10.2.2(C)(i).

The Merger Agreement is "governed by and construed in accordance with the laws of the State of Delaware." *Id.* § 11.9.

P:\ORDERS\11-2018\3546MDism.docx 190226.1557

## C.     The Directors' Voting Agreements

Each Director separately executed a Voting Agreement [Doc. # 1-2] with Hanmi.  Under their Voting Agreements, each Director agreed to vote their SWNB shares in favor of the merger.  *Id.* § 4.  The Directors further agreed to vote "against any action, proposal, transaction or agreement that would reasonably be likely to . . . prevent, impede, interfere with, delay, postpone, discourage or frustrate the purposes of or adversely affect the consummation of the transactions contemplated by the Merger Agreement." *Id.*  These obligations are subject to the following exception:

> [T]he foregoing applies solely to the Shareholder [*i.e.*, the Director,] in his or her capacity as a shareholder and, to the extent the Shareholder serves as a member of the board of directors or as an officer of SWNB, nothing in this Agreement shall limit or affect any actions or omissions taken by the Shareholder solely in the Shareholder's capacity as such a director or officer and not in violation of the Merger Agreement.

*Id.*

The Voting Agreements are "governed by, and shall be interpreted in accordance with, the laws of the State of Delaware." *Id.* § 10.

## D.     SWNB's Board Recommends Merger

On July 12, 2018, SWNB's Board released a proxy statement to its stockholders, recommending merger:

> After careful consideration . . . the SWNB board of directors determined that the merger is in the best interests of SWNB and its stockholders and the consideration to be received in the merger is fair to the SWNB stockholders.  Accordingly, the SWNB board of directors unanimously approved the merger agreement and recommended that the SWNB stockholders vote 'FOR' the merger agreement.

Complaint ¶ 42 (emphasis removed).   The proxy statement went on to state:

[T]he SWNB board of directors also considered potential risks and potentially negative factors concerning the merger in connection with its deliberations of the proposed transactions, including the following materials: . . . the fact that the merger consideration, which consists primarily of shares of Hanmi common stock, provides less certainty of value to SWNB stockholders compared to a transaction in which they would receive only cash consideration [and that] the potential for a decline in the value of Hanmi common stock—whether before or after consummation of the merger—which would reduce the value of the consideration received by SWNB's stockholders.

*Id.* ¶ 49 (emphasis removed). The board's proxy statement warned that "[b]ecause the market price of Hanmi common stock will fluctuate, SWNB stockholders cannot be certain of the market value of the merger consideration they will receive." *Id.* ¶ 50.

## E. Hanmi's Stock Price Fluctuates and SWNB Receives More Merger Consideration

Following the announcement of the merger in May 2018, Hanmi's stock price rose from $28.05 on May 14 to a high of $30.90 on June 7, 2018. *Id.* ¶ 43. Hanmi's stock price then declined. *Id.* On August 8, 2018, Hanmi's stock traded at $25.65. *Id.*[7]

---

[7] Normally, at the motion to dismiss stage, "courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996). SWNB nevertheless submits various documents with its Motion, including Hanmi's SEC filings, press releases related to Hanmi's financial performance, press releases related to a Hanmi leadership transition after the merger announcement. *See* Doc. # 16-2. SWNB contends the Court may take judicial notice of these documents for purposes of deciding the Motion.

The Court may not take judicial notice of these documents. At the motion to dismiss stage, a district court may take judicial notice of facts under Federal Rule of Evidence 201. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011). Under Rule 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's

(continued…)

P:\ORDERS\11-2018\3546MDism.docx 190226.1557

SWNB's stockholders were originally scheduled to vote on the merger on August 16, 2018. *Id.* ¶ 45. Eight days before the scheduled vote, on August 8, 2018, SWNB notified Hanmi that its Board voted to change its recommendation to its stockholders regarding the merger in order to fulfill its fiduciary obligations. *Id.* SWNB notified Hanmi that its Board would issue an adverse recommendation, advising the stockholders to vote against the merger. *Id.* The only fact or circumstance SWNB allegedly cited for its changed recommendation was the reduction in Hanmi's stock price, which would have resulted in an approximately 8% decline in the total merger consideration. *Id.* ¶ 46.

Hanmi alleges that SWNB used the drop in Hanmi's share price as "an opportunity to extract more Merger consideration from Hanmi by throwing the Merger into doubt." *Id.* ¶ 44. Alternatively, Hanmi alleges that SWNB's board "simply experienced seller's remorse." *Id.* Hanmi alleges that at no time did Sheshunoff rescind or modify its fairness opinion. *Id.* ¶ 47. Moreover, "SWNB's Board stated it would not notify the stockholders of the Adverse Recommendation

---

(continued…)

territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. SWNB's appended documents satisfy neither criteria. Hanmi's evolving financial and leadership situation in 2018 is not "generally known" in the Southern District of Texas. *See id.* Nor does SWNB convincingly argue that the "accuracy" of SEC filings and press reports "cannot reasonably be questioned." *See id.* While the Fifth Circuit has allowed consideration of SEC filings at the motion to dismiss phase, "[s]uch documents should be considered only for the purpose of determining what statements the documents contain, *not* to prove the truth of the documents' contents." *See Lovelace*, 78 F.3d at 1018 (emphasis added). Here, SWNB asks the Court to consider the SEC statements "to prove the truth of the documents' contents," *i.e.*, what Hanmi's actual financials were, not what Hanmi reported its financials were. *See id.*

and would leave open the possibility that it would revert to its original recommendation if Hanmi increased Merger consideration." *Id.* ¶ 51.

On August 14, 2018, SWNB's Board voted to rescind the adverse recommendation and to postpone the August 16 stockholder vote until August 28. *Id.* ¶ 54.

On August 20, 2018, Hanmi agreed, pursuant to a Merger Amendment [Doc. # 1-3], to increase the merger consideration. *Id.* ¶ 52. Prior to the Amendment, SWNB stockholders were to receive 80% Hanmi stock and 20% cash for their SWNB shares. *Id.* ¶ 53. Pursuant to the Amendment, the allocation became 70% Hanmi stock and 30% cash. *Id.*

### F. The Shareholder Vote Fails, SWNB Changes Its Executive Officers, and Hanmi Approves Termination of the Merger

In the last few days prior to the August 28 stockholder vote, Hanmi alleges "SWNB's Board refused to act in support of the Merger." Complaint ¶ 58. A Director and spokesperson for SWNB's board allegedly stated "that SWNB would not reach out to its stockholders regarding the Merger" and "that 'it was not their job' to promote the Merger to SWNB's stockholders." *Id.* Hanmi alleged further that SWNB board members "contacted SWNB's stockholders to hinder the vote and terminate the Merger." *Id.* ¶ 59.

On August 28, 2018, only 56% of the SWNB stock was voted in favor of the deal, not the two-thirds required for merger approval. *Id.* ¶ 60. All Directors voted their stock (48% of the total shares) in favor of merger. *Id.*

On or about September 12, 2018, SWNB announced the replacement of its CEO and president Gary Owens with George Lee. *Id.* ¶ 62. Mohammed Younus was also named president of Southwestern National Bank. *Id.* As of the time of this change in leadership, neither Hanmi nor SWNB had terminated the Merger Agreement. *Id.*

Upon taking office, George Lee publicly announced the effective end of the merger, claiming that SWNB was "here to grow" on its own. *Id.* ¶ 63. Lee further stated that the parties were "assessing their options," adding that the merger failed because of "fundamental differences" between Hanmi and SWNB. *Id.* SWNB did not notify Hanmi in advance regarding its leadership change or the public announcements. *Id.* ¶ 64.

On September 26, 2018, Hanmi's board approved termination of the Merger Agreement based on SWNB's alleged breaches. *Id.* ¶ 65. Hanmi notified SWNB of its decision and demanded payment of the $3.12 million termination fee, damages, costs, and expenses incurred in connection with the failed merger. *Id.* *See* Merger Agreement § 10.2.2.

### G.    Hanmi Files Suit

Hanmi filed this suit on October 2, 2018, alleging two causes of action. *Id.* ¶¶ 66-80. First, against SWNB, Hanmi asserts a claim for breach of the Merger Agreement's various deal protection devices. *Id.* ¶¶ 66-72. Hanmi alleges that SWNB breached the Agreement by, among other things, (1) voting to adopt an adverse recommendation, (2) failing to use its best efforts to promote the merger in the last few days before the August 28, 2018, shareholder vote, (3) and permitting SWNB Board members to contact shareholders to persuade them to vote against the merger. *See* Merger Agreement §§ 6.1.1, 6.8, 8.1.1.

Second, against the Directors individually, Hanmi asserts a claim for breach of the implied covenant of good faith and fair dealing. Complaint ¶¶ 73-80. According to Hanmi, "the purpose and fundamental premise" of the Voting Agreements was to "ensure SWNB's compliance with its obligation to use all best reasonable efforts to cause stockholder approval of the Merger Agreement and consummation of the Merger." *Id.* ¶ 77. The Directors allegedly frustrated this purpose by "deceitfully implement[ing] a plan to give the appearance of complying

with the Voting Agreement by voting in favor of the Merger while at the same time persuading a sufficient number of non-director stockholders to vote against the Merger." *Id.* ¶ 78.

Defendants SWNB and the Directors move to dismiss both claims. *See* Motion [Doc. # 17].

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147. The complaint must, however, contain sufficient factual allegations, as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012).

When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679. Rule 8 "generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). Additionally, regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).

## IV. DISCUSSION

As previously stated, Hanmi asserts different claims against SWNB and the Directors. Hanmi claims SWNB breached the Merger Agreement's various deal

protection devices and the Directors breached the Delaware-recognized implied covenant of good faith and fair dealing with respect to their Voting Agreements. Defendants move to dismiss both claims. The Court **denies** Defendants' Motion with respect to Hanmi's claim against SWNB and **grants** their Motion with respect to Hanmi's claims against the Directors.

### A. Hanmi's Claim Against SWNB for Breach of the Merger Agreement

SWNB does not contest that Hanmi adequately alleges SWNB violated the Merger Agreement's various deal protection devices. Instead, SWNB argues those provisions are unenforceable. According to SWNB, these clauses are invalid because they impinge on the Board's fiduciary duties to ensure the merger remains in the shareholders' best interests and to advise the shareholders accordingly, until the shareholder vote. Alternatively, SWNB contends that Hanmi's allegations establish that SWNB properly invoked the Merger Agreement's "fiduciary out" clause. Finally, SWNB argues that Hanmi's own allegations demonstrate that the merger did not fail because of SWNB's failure to use its best efforts.

The Court is unpersuaded by SWNB's arguments and concludes that Hanmi has adequately alleged a claim for breach of the Merger Agreement. Defendants' Motion is **denied** with respect to this claim.

### 1. Governing Law

"Because this is a diversity case, the forum state of Texas provides the law that governs [the Court's] choice-of-law analysis." *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015) (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The Merger Agreement states that it is governed by Delaware law, *see* Merger Agreement § 11.9, and Texas courts will generally enforce such choice of law clauses, *see Fagan Holdings, Inc. v. Thinkware, Inc.*,

750 F. Supp. 2d 820, 824-25 (S.D. Tex. 2010). Consequently, the Court applies Delaware law to interpret the Merger Agreement and determine its enforceability.

SWNB, however, is a Texas corporation. Complaint ¶ 7. As such, its directors' fiduciary duties are governed by the law of Texas, not Delaware, under Texas's "internal affairs doctrine." *See Hollis v. Hill*, 232 F.3d 460, 464-65 (5th Cir. 2000). Thus, Texas law, not Delaware law, provides the operative standard for directors' fiduciary duties. Nevertheless, as explained below, Texas law models Delaware law governing directors' fiduciary duties in the merger context.

In Texas, a corporation's board of directors, not its shareholders, "exercise[s] or authorize[s] the exercise of the powers of the corporation" and "direct[s] the management of the business and affairs of the corporation." *See* TEX. BUS. ORGS. CODE ANN. § 21.401(a). "Three broad duties stem from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty, and due care." *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984) (reciting Texas law). "The duty of obedience requires a director to avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation." *Id.* "The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation." *Id.* Finally, "the duty of care requires a director to be diligent and prudent in managing the corporation's affairs." *Id.* at 720.

The broad outlines of director fiduciary duties under Texas law are well established. Neither party, however, has cited Texas authority discussing directors' fiduciary duties in the corporate merger context and the Court's own research similarly has not located definitive authority. Nevertheless, "Texas courts consider Delaware decisional law persuasive in resolving unsettled issues of Texas corporate law." *See Nerium SkinCare, Inc. v. Nerium Int'l, LLC*, No. 3:16-CV-

14

1217-B, 2017 WL 9471419, at *2 (N.D. Tex. Apr. 5, 2017) (citation omitted). *See also In re Aguilar*, 344 S.W.3d 41, 47 (Tex. App.—El Paso 2011, no pet.) (recognizing that "[c]ourts throughout the country look to Delaware for guidance on matters of corporate law" and Delaware "has been described as 'the Mother Court of corporate law'"); *Neurobehavorial Assocs., P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (relying on Delaware corporate law for "guidance" when the Texas court found "no Texas case that addresse[d]" the specific corporate law question at issue). Accordingly, this Court concludes that Texas courts would adopt Delaware fiduciary law in the merger context and applies Delaware law in its analysis.

### 2. SWNB Does Not Demonstrate that the Merger Agreement's Deal Protection Devices Are Unenforceable

SWNB argues that the Merger Agreement's deal protection devices are unenforceable to the extent they restrict the exercise of its Board's fiduciary duties. Specifically, SWNB asserts that Delaware law does not tolerate any restraints on directors' ability to communicate with shareholders about a proposed merger, at least until the shareholder vote on the merger. The Court is unpersuaded that the questioned deal protection devices are invalid and unenforceable under Delaware law.

### a. Delaware's General Preference for Enforcement of Voluntary Agreements Between Sophisticated Parties

The "strong American tradition of freedom of contract" is "especially strong" in Delaware. *See Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006). "Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009). Delaware courts are "especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts." *See Abry Partners*,

891 A.2d at 1061-62. Doing so risks "inhibit[ing] economic activity that might be valuable to the parties and society more generally." *Id.* at 1061.

In light of Delaware's strong public policy favoring freedom of contract, Delaware courts are "reluctant to accept" arguments for the avoidance of a contract based on a putative conflict with public policy. *Libeau v. Fox*, 880 A.2d 1049, 1058 (Del. Ch. 2005), *aff'd in pertinent part*, 892 A.2d 1068 (Del. 2006). For such an argument to prevail, a party must make "a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract." *Id.* at 1056.

### b. Invalidity of Agreements Premised on Breach of Fiduciary Duty

Delaware courts' *laissez-faire* approach "to agreements freely negotiated between sophisticated parties is limited by fiduciary principles." *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840 (Del. Ch. 2011). "If a contract with a third-party is *premised* upon a breach of fiduciary duty, the contract may be unenforceable on equitable grounds and the third-party can find itself lacking the rights it thought it had secured." *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) (Strine, then V.C.) (emphasis added). An entity that knowingly aids a breach of fiduciary duty cannot be "heard to argue that it obtained vested contract rights." *Paramount Commc'n Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (1994). A contract is invalid on fiduciary grounds "[o]nly if the directors breached their fiduciary duties when *entering* into a contract." *Frederick Hsu Living Tr. v. ODN Holding Corp.*, No. 12108-VCL, 2017 WL 1437308, at *23 (Del. Ch. Apr. 14, 2017). Directors' fiduciary duties are "unremitting," *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 938 (Del. 2003), and cannot be "contract[ed] away," *QVC*, 637 A.2d at 51. Their duties do not cease "after a merger agreement is announced." *Omnicare*, 818 A.2d at 938. But the "fiduciary status of directors

16

does not give them Houdini-like powers to escape from valid contracts."
*Frederick Hsu Living Tr.*, 2017 WL 1437308, at *23.[8] "[D]espite the existence of
some admittedly odd authority on the subject, it remains the case that Delaware
entities are free to enter into binding contracts . . . so long as there was no breach
of fiduciary duty involved when entering into the contract in the first place."
*WaveDivision Holdings, LLC v. Millennium Digital Sys., L.L.C.*, No. 2993-VCS,
2010 WL 3706624, at *17 (Del. Ch. June 18, 2010) (Strine, then V.C.). "[T]he
fact that a corporation is bound by its valid contractual obligations does not mean
that a board does not owe fiduciary duties when considering how to handle those
contractual obligations; it rather means that the directors must evaluate the
corporation's alternatives in a world where the contract is binding." *Frederick Hsu
Living Tr.*, 2017 WL 1437308, at *24.[9]

---

[8]    *See Halifax Fund, L.P. v. Response USA, Inc.*, No. CIV.A.15553, 1997 WL
33173241, at *2 (Del. Ch. May 13, 1997) ("[T]here is no Delaware case that holds
that the management of a Delaware corporation has a fiduciary duty that overrides
and, therefore, permits the corporation to breach, its contractual obligations.");
*Corwin v. DeTrey*, No. CIV. A. 6808, 1989 WL 146231, at *4 (Del. Ch. Dec. 4,
1989) ("[T]he directors of the selling corporation are not free to terminate an
otherwise binding merger agreement just because they are fiduciaries and
circumstances have changed.").

[9]    It is worth noting that "[e]ven with an iron-clad contractual obligation, there
remains room for fiduciary discretion because of the doctrine of efficient breach."
*Frederick Hsu Living Tr.*, 2017 WL 1437308, at *24. "Under that doctrine, a
party to a contract may decide that its most advantageous course is to breach and
pay damages." *Id.* "Just like any other decision maker, a board of directors may
choose to breach if the benefits (broadly conceived) exceed the costs (again
broadly conceived)." *Id.*

### c. "Reasonable" Deal Protection Devices Under "Enhanced Judicial Scrutiny"

Delaware recognizes that boards have "authority to give the proponent of a recommended merger agreement reasonable structural and economic defenses, incentives, and fair compensation if the transaction is not completed." *Omnicare*, 818 A.2d at 938. This acknowledges that, when properly used, deal protection devices "can facilitate a transaction and thus add value for the stockholders." *In re BioClinica, Inc. S'holder Litig.*, No. CV 8272-VCG, 2013 WL 5631233, at *8 n.70 (Del. Ch. Oct. 16, 2013). Delaware courts "do[] not presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1015-16 (Del. Ch. 2005) (Strine, then V.C.). Instead, they recognize that whether a contract is invalid on fiduciary grounds is a "fact-intensive" inquiry not subject to any "bright-line" rule. *See Sample*, 914 A.2d at 673. *Cf. Toys "R" Us*, 877 A.2d at 1015-16 (noting that the determination of whether a deal protection device violates a board's fiduciary duties is a "nuanced, fact-intensive inquiry"); *In re TriQuint Semiconductor, Inc. Stockholders Litig.*, No. 9415-VCN, 2014 WL 2700964, at *3 (Del. Ch. June 13, 2014) (same). A contract is not "invalid simply because it delimited the range of discretion the directors otherwise had under the law to act." *Sample*, 914 A.2d at 673.

Broad language in two Delaware Supreme Court cases, *QVC* and *Omnicare*, does suggest that any contractual provision that limits a board's freedom to act in its shareholders' interests is *per se* unenforceable. *See QVC*, 637 A.2d at 51 ("To the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable."); *Omnicare*, 818 A.2d at 936 (quoting *QVC*). However, in

both cases, the Delaware Supreme Court performed detailed, factual analyses to conclude the deal protection devices were invalid on fiduciary grounds. Both cases were heavily informed by the surrounding factual circumstances and the particularities of the merger agreement's terms.

In *QVC*, the target board originally entered into a merger agreement containing a no-shop provision, a $100 million termination fee, and, most importantly, a stock-option agreement, which contained "unusual and potentially 'draconian' provisions." 637 A.2d at 39, 49. Under the stock-option agreement, if the merger failed, the potential acquirer had the option to purchase roughly 20% of the target's outstanding shares at a set price. *Id.* at 39. To pay the agreed price, the potential acquirer could use a "note of questionable marketability instead of cash." *Id.* Additionally, the potential acquirer could elect to require the target to pay the acquirer a sum equal to the difference between the market price of the target's stock and the agreed upon purchase price. *Id.* Because this sum was "not 'capped' to limit its maximum dollar value, it had the potential to reach (and . . . did reach) unreasonable levels." *Id.* After agreeing to these terms, the target received a more favorable bid, giving the target board "considerable leverage" with the first potential acquirer. *Id.* at 40. With that leverage, the target board negotiated an amended merger agreement, providing its shareholders more merger consideration. *Id.* The target board, however, took no efforts to "use its newly-acquired leverage to eliminate or modify" the no-shop provision, the termination fee, or the stock-option agreement. *Id.* The target board ultimately rejected a revised competing bid from the other potential acquirer valued at over $1 billion more than the first potential acquirer's bid. *Id.* at 50. After considering this "context" and all the "circumstances," the Delaware Supreme Court held the target board breached its fiduciary duties and the potential acquirer had no vested contract rights under the merger agreement. *See id.* at 50-51.

19

In *Omnicare*, the target board entered into a merger agreement that required it to submit the merger to a shareholder vote. 818 A.2d at 936. This deal protection device was combined with specifically enforceable, irrevocable shareholder voting agreements by a cohesive block of controlling shareholders that guaranteed the merger would be approved when put to the shareholder vote. *Id.* at 936-39. This combination "predetermined the outcome of the merger without regard to the merits of the . . . transaction at the time the vote was scheduled to be taken," and "completely prevented the board from discharging its fiduciary responsibilities . . . when [a competing bidder] presented its superior transaction." *Id.* at 936. The Delaware Supreme Court held that the "merger agreement and voting agreements, as they were combined to operate in concert in this case, [were] inconsistent with the [target board's] fiduciary duties," and, "[t]o that extent," the agreements were unenforceable. *Id.* at 939.

In both *QVC* and *Omnicare*, the Delaware Supreme Court did not hold the devices invalid simply because they generally circumscribed the target board's freedom to act. Moreover, lower Delaware courts have not applied the language in a rote manner or imposed a rigid standard. *See Sample*, 914 A.2d at 672-73; *Toys "R" Us*, 877 A.2d at 1015-16; *TriQuint Semiconductor*, 2014 WL 2700964, at *3. As then Vice Chancellor Strine, now Chief Justice of the Delaware Supreme Court, observed in *Sample*, "[b]oards of directors necessarily limit their future range of action all the time." 914 A.2d at 671. A literal reading of *QVC* and *Omnicare* would render directors "unable to manage, because they would not have the requisite authority to cause the corporation to enter into credible commitments with other actors in commerce." *Id.* at 672 n.79. Nevertheless, Delaware courts are wary of such deal protection devices as they can be used to shortchange shareholders by, for example, preventing target boards from seeking or accepting

more lucrative merger offers. Accordingly, deal protection devices "must withstand enhanced judicial scrutiny." *Omnicare*, 818 A.2d at 931.

Delaware courts subject deal protection devices to scrutiny under the two-part test in *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985). First, the target board must have "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed," usually the threat of losing the merger offer and being left with no comparable alternative transaction. *See Omnicare*, 818 A.2d at 935 (quoting *Unocal*, 493 A.2d at 955). Second, the target board's "defensive response" to the threat must have been "reasonable in relation to the threat posed." *Id.* (quoting *Unocal*, 493 A.2d at 955). This second step itself contains two parts. *Id.* First, the deal protection devices must not, operating alone or in concert, be "preclusive or coercive"—*i.e.*, have the effect of or be designed to render the merger a "*fait accompli.*" *See id.* at 935-36. Next, if the devices are not coercive or preclusive, they must be "within a 'range of reasonable responses' to the threat perceived." *Id.* at 935 (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1387-88 (Del. 1995)). In this analysis, deal protection devices must be reviewed on a "cumulative basis." *See In re Answers Cop. S'holders Litig.*, No. 6170-VCN, 2011 WL 1366780, at *4 (Del. Ch. Apr. 11, 2011).

A coercive or preclusive merger agreement may be cured with a fiduciary out clause under certain circumstances. *See Omnicare*, 818 A.2d at 939.[10] As

---

[10] *See also Dent v. Ramtron Int'l Corp.*, No. CIV.A. 7950-VCP, 2014 WL 2931180, at *8 (Del. Ch. June 30, 2014) ("[T]he no-solicitation provision is coupled with a reasonable 'fiduciary out' clause, which mitigates any 'preclusive' restrictions on the [target board's] ability to consider other potentially value-maximizing transactions."); *Koehler v. Net Spend Holdings Inc.*, No. 8373-VCG, 2013 WL 2181518, at *17 (Del. Ch. May 21, 2013) ("Concerns raised by the [shareholder] that the voting agreements impermissibly lock up the deal are alleviated by the fiduciary-out clause of the Merger Agreement."); *In re Orchid Cellmark Inc.*

(continued…)

previously stated, fiduciary out clauses "allow[] the target company's board of directors not to comply with some, or all, of the directors' obligations under the agreement if it is necessary for them to avoid a breach of fiduciary duties." *See* Julian Velasco, *Fiduciary Duties and Fiduciary Outs*, 21 GEO. MASON L. REV. 157, 157 (2013). A fiduciary out clause is not a panacea, however. As noted, in *Omnicare*, the Delaware Supreme Court held that the merger was absolutely locked, even though the board could recommend against shareholder approval of the merger. *See id.* at 925, 939. The Delaware Supreme Court held the merger and voting agreements, when combined, operated "in concert as an absolute lock up, in the absence of an *effective* fiduciary out clause." *Id.* at 939 (emphasis added). Given this "absolute lock up," the target board "was required to contract for an effective fiduciary out clause to [enable it to] exercise its continuing fiduciary responsibilities." *Id.* While the *Omnicare* Court did not define "effective," at least one lower Delaware court has noted that the addition of a fiduciary out clause will *not* save a series of agreements that, when combined with the fiduciary out clause, still "guarantees the consummation of the original transaction, however more valuable an alternative transaction may be and however less valuable the original transaction may have become since the merger agreement was signed." *See ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999).

---

(continued…)
*S'holders Litig.*, No. 6373-VCN, 2011 WL 1938253, at *7 (Del. Ch. May 12, 2011) (noting that the merger agreement's no-shop provision was "balanced by a fiduciary out"); *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 502 (Del. Ch. 2010) ("While it is true that the no-shop provision with [the acquirer] caused [the target] to rescind [a competitor's] data room access, this is mitigated by the reasonable fiduciary out clause in the Merger Agreement.").

### d. Based on the Facts Hanmi Alleges, SWNB Did Not Breach Its Fiduciary Duty by Agreeing to the Deal Protection Devices in this Case

SWNB challenges the Merger Agreement's deal protection devices on the ground that they impede its Board's exercise of its fiduciary duties to "review and update" its merger recommendation, "communicate truthfully with its stockholders," and "disclose fully and fairly all material information" to shareholders. *See In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 491-92, 495 (Del Ch. 2013). SWNB asserts that Delaware courts hold *per se* invalid all restraints, procedural or otherwise, on a board's ability to communicate to its shareholders. SWNB does not address the Merger Agreement's specific deal protective devices, the Merger Agreement's fiduciary out, or the circumstances that led its Board to accept the combination of measures.

As noted, contrary to SWNB's assertion, whether a contract is invalid on fiduciary grounds is a "fact-intensive" inquiry not subject to any "bright-line" rule. *See, e.g.*, *Sample*, 914 A.2d at 673. A contract is not "invalid simply because it delimited the range of discretion the directors otherwise had under the law to act." *Id.* SWNB has not established that the deal protection devices were *ex ante* unreasonable or that the fiduciary out clause was ineffective. *See Omnicare*, 818 A.2d at 939. Therefore, the Court cannot conclude at this stage that SWNB's Board breached its fiduciary duties by agreeing to the various deal protection devices at issue. For purposes of SWNB's Motion to Dismiss, the Court holds that, as written, the Merger Agreement's terms are not unenforceable.

The Merger Agreement's fiduciary out clause permits SWNB's Board to change its recommendation and disclose information to shareholders should the Board conclude in good faith that failure to take such action would violate its fiduciary duties. *See* Merger Agreement § 8.1.2. Exercise of the fiduciary out

clause is limited by three requirements: that the clause be exercised (i) in good faith,[11] (ii) after consultation with outside counsel,[12] and (iii) no less than 24-hours after written notice to Hanmi.[13]  *See id.*  These three restraints in the Merger Agreement are not onerous or unreasonable in the abstract, or in the particular circumstances Hanmi alleges existed when the Merger Agreement was entered into.[14]  SWNB's Board thus could "review and update" its merger recommendation, "communicate truthfully with its stockholders," and "disclose

---

[11]   Delaware courts uphold requirements that fiduciary out clauses be exercised in good faith.  *See, e.g.*, *Cogent*, 7 A.3d at 502 (upholding a merger agreement's fiduciary out clause that could be exercised only when the target board determined "in good faith" that engaging with another bidder would reasonably be expected to result in a superior merger proposal). This Court has found no Delaware authority holding that the requirement that a fiduciary out clause be exercised in good faith is an invalid restraint on fiduciary grounds.

[12]   With respect to the consultation requirement, a board has a fiduciary "duty to determine what its own fiduciary obligations require." *ACE Ltd.*, 747 A.2d at 106. In *ACE Ltd.*, the Delaware court cautioned that a fiduciary out clause may not save a deal protection device because exercise of the fiduciary out was conditioned "on the written advice of [the target's] outside legal counsel" that negotiations were "required" to prevent a breach of the target board's fiduciary duties. *See id.* at 98. Here, by contrast, the fiduciary out clause only requires the Board to consult with outside counsel.  The fiduciary out does not delegate to another entity the Board's ultimate judgment over what its fiduciary duties require.

[13]   The fiduciary out clause's one-day notice requirement is "unremarkable," "customary," and reasonable. *See Dent*, 2014 WL 2931180, at *9. *See also In re Micromet. Inc. S'holders Litig.*, No. 7197-VCP, 2012 WL 681785, at *9 (Del. Ch. Feb. 29, 2012) (upholding four-day notice period).

[14]   *Primedia* does not suggest that any of these restraints are unreasonable or render the fiduciary out clause ineffective.  Indeed, in *Primedia*, the Delaware court reviewed a merger agreement for breach of a fiduciary duty *without even mentioning* a restraint similar to that in the case at bar.  *See* 67 A.3d at 492-93. There, as here, the fiduciary out clause required the target board to determine, in good faith, after consultation with outside counsel, that a recommendation in favor of merger would be inconsistent with its fiduciary duties. *See id.*

24

fully and fairly all material information" to its shareholders. *See Primedia*, 67 A.3d at 491-92, 495. The Court is not persuaded that the deal protection devices in combination with the fiduciary out clause's mild restraints precluded the Directors from effectively communicating a change in circumstances to other shareholders, and the merger was not a *fait accompli* regardless of changed circumstances. *See Omnicare*, 818 A.2d at 935-36. The Court is unpersuaded, given the existence of a fiduciary out clause not proven to be ineffective, that the deal protection devices under the facts alleged are unenforceable.

### 3. Hanmi Adequately Pleads that SWNB Breached the Merger Agreement

SWNB next contends that, even if the Merger Agreement is enforceable as written, Hanmi's allegations demonstrate that SWNB properly availed itself of the fiduciary out clause. SWNB argues that Hanmi's allegations demonstrate that the drop in Hanmi's share price compelled its Board to threaten an adverse recommendation and ultimately to advise shareholders to vote against the merger. The Court concludes that Hanmi alleges facts plausibly demonstrating SWNB failed properly to invoke its contractual fiduciary out clause.

SWNB's fiduciary out clause gives SWNB's Board two options. *See* Merger Agreement § 8.1.2. First, "SWNB's Board of Directors" may "withdraw, modify, or change" its recommendation that SWNB stockholders approve the merger. *See id.* SWNB may exercise this option "if it concludes in good faith (after consultation with its outside legal advisors) that the failure to do so would cause it to violate its fiduciary duties under applicable law." *Id.* Second, SWNB may "disclos[e] any information to its stockholders that the Board of Directors of SWNB determines in good faith (after consultation with its outside legal counsel) that it is required to disclose in order to not breach its fiduciary duties to SWNB's stockholders under applicable law." *See id.* Before SWNB changes its

recommendation or discloses information to its stockholders, SWNB must have "given Hanmi written notice promptly (and in any event within twenty-four (24) hours) advising it of the decision of SWNB's Board of Directors to take such action." *See id.*[15]

Hanmi's allegations regarding the individual board members' obstructive conduct in the days approaching the August 28 shareholder vote do not fall within either fiduciary out clause alternative. Hanmi alleged that "members of SWNB's Board actively contacted SWNB's stockholders to hinder the vote and terminate the Merger." Complaint ¶ 59. Hanmi does not allege facts suggesting that "SWNB's Board of Directors," rather than individual Board members unilaterally, reached the conclusion that this disclosure was required by the Board's fiduciary duties. Nor does Hanmi allege that the disclosures occurred "after [the Board's] consultation with its outside legal advisors" or that SWNB sent Hanmi "written notice" within 24 hours of the Board's action.

Finally, Hanmi alleges facts to support its contention that the individual board members' disclosures were not in good faith. To plead a violation of a contractually imposed duty of good faith, Hanmi must plead SWNB's Board "acted in subjective bad faith" or "consciously disregarded a known duty to act." *CDX Holdings, Inc. v. Fox*, 141 A.3d 1037, 1043 (Del. 2016). To plead "subjective bad faith," Hanmi must plead facts demonstrating that "a majority of [SWNB's Board] did not subjectively believe" the disclosures were compelled by their fiduciary duties. *See id*. Liberally construing Hanmi's Complaint, as the

---

[15]     The second option requires prompt written notice to Hanmi before the right to disclose negative information to the SWNB shareholders can be exercised. By the second option's terms, it is "subject to compliance with the requirements of Section 8.1.2." The Court reads this qualification to refer to the previously stated requirements, which includes a requirement of prompt written notice.

Court must on a Rule 12(b)(6) motion, the sole legitimate basis SWNB's Board had for scuttling the merger was Hanmi's 8% stock price decline. The validity of this basis was undermined by Hanmi's agreement to increase the cash merger consideration to SWNB's shareholders. Given the increased merger consideration and the Board's formal withdrawal of its adverse recommendation, an inference could be drawn that the Board members' disclosures to shareholders were not motivated by their exercise of fiduciary responsibilities to maximize value for the shareholders.

Hanmi plausibly alleges that SWNB's Board did not avail itself in good faith of the Merger Agreement's fiduciary out clause. Accordingly, Hanmi has adequately pleaded a breach of the Merger Agreement.

### 4. Hanmi Adequately Alleges SWNB's Breach Caused Hanmi Damages

SWNB finally argues that Hanmi failed to allege SWNB's breach of the Merger Agreement caused Hanmi to suffer damages. To support its argument, SWNB observes that SWNB's Board only constituted 48% of SWNB's voting shares while the merger required a two-thirds majority to pass. This argument lacks merit. Hanmi alleges that SWNB's Board persuaded other stockholders to vote against the merger, an adequate allegation of causation.

In sum, Hanmi has sufficiently pleaded a breach of contract claim against SWNB.

### B. Hanmi's Claim of Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Directors

Hanmi claims each Director breached an implied covenant under his or her Voting Agreement to use all reasonable efforts to consummate the merger. The Directors respond that the Voting Agreements, by their express terms, only cover their actions as shareholders, not as members of SWNB's Board. After careful consideration of the Voting and Merger Agreements, and applicable law, the Court

is persuaded by the Directors' argument. Hanmi's claim against them for violation of their Voting Agreements will be **dismissed**.

### 1. Legal Standard for Breach of the Delaware Implied Covenant of Good Faith and Fair Dealing

The Voting Agreements are governed by Delaware law. Voting Agreement § 10; *Fagan Holdings*, 750 F. Supp. 2d at 824-25. Under Delaware law, "[t]he implied covenant of good faith and fair dealing inheres in every contract." *Klig v. Deloitte LLP*, 36 A.3d 785, 796 (Del. Ch. 2011) (quoting *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009)). It "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Id.* at 796-97 (quoting *Kuroda*, 971 A.2d at 888). "The covenant is 'best understood as a way of implying terms in the agreement,' whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (footnotes omitted) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996)).

"[T]he implied covenant is only rarely invoked successfully." *Kuroda*, 971 A.2d at 888. "[T]o state a claim for breach of the implied covenant, [a plaintiff] 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Id.* (quoting *Fitzgerald v. Cantor*, No. C.A. 16297-NC, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)). "General allegations of bad faith conduct are not sufficient," and "[t]he implied covenant cannot be invoked to override the express terms of the contract." *Id.* "The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991

28

A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap*, 878 A.2d at 441). "[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play." *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992).

## 2. Hanmi Fails to State a Claim for Breach of the Implied Covenant

The Voting Agreements required the Directors, "solely" in their capacity as shareholders, to vote in favor of the merger and vote against actions that would adversely affect the merger's prospects. *See* Voting Agreement § 4. These obligations "appl[y] solely" to the Directors' capacity as shareholders. *Id.* These requirements do not "limit or affect any actions or omissions taken by" a Director solely in his or her "capacity as such a director or officer and not in violation of the Merger Agreement." *Id.*

Hanmi does not assert that the Directors breached an express provision of their Voting Agreements. Rather, Hanmi asserts that, under the Voting Agreements, each Director had an implied duty to use all reasonable efforts to consummate the merger so as to give Hanmi the benefit of its bargain. The Directors breached this implied duty, according to Hanmi, by approving the adverse recommendation, persuading non-director stockholders to vote against the merger, and preventing SWNB from using its reasonable efforts to consummate the merger.

Hanmi's position is unavailing. The Voting Agreements, by their express terms, "appl[y] solely" to the Directors' duties as shareholders. *See id.* By expressly restricting the Agreements' scope, the parties were "intentionally silent" with respect to the Directors' duties as members of SWNB's board. *See Dave Greytak Enters.*, 622 A.2d at 23. This is not a case where it is necessary for the

Court to "infer contractual terms to handle developments or contractual gaps that . . . neither party anticipated." *See Nemec*, 991 A.2d at 1125. It is clear both from the language of the Voting Agreements and the broader context that parties relied on the Merger Agreement to compel SWNB's Board to use reasonable efforts to consummate the merger. As no "unanticipated developments" occurred and no contractual "gap[]" exists, the Court cannot imply an additional duty. *See Dunlap*, 878 A.2d at 441. Hanmi's claim must be dismissed for failure to allege an essential element.[16] *See Kuroda*, 971 A.2d at 888-89. *Cf. WaveDivision*, 2010 WL 3706624, at *19 & n.129 (dismissing an implied covenant claim when the conduct allegedly in breach of the covenant was covered by the merger agreement's best efforts provision).

## V.   CONCLUSION AND ORDER

For the foregoing reasons, Hanmi's breach of contract claim against SWNB survives. Under Hanmi's allegations, the Merger Agreement's deal protection devices are enforceable, SWNB breached the deal protection devices, and SWNB did not properly avail itself of its contractual "fiduciary out" rights. By contrast, Hanmi's claims against the Directors for breach of the implied covenant will be dismissed. The duties Hanmi asks the Court to read into the Voting Agreements are already covered by the parties' Merger Agreement. It is accordingly

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 16] is **DENIED** with respect to Hanmi's breach of contract claim against SWNB. It is further

---

[16]   It is not apparent how Hanmi can cure this pleading deficiency in light of the operative contracts. However, Hanmi may seek leave to amend its Complaint by motion with a proposed amended complaint attached if it can do so within the strictures of Federal Rule of Civil Procedure 11.

**ORDERED** that Defendants' Motion to Dismiss [Doc. # 16] is **GRANTED** with respect to Hanmi's claim against the Directors for breach of the implied covenant of good faith and fair dealing, and the claim is **DISMISSED**.  It is further

**ORDERED** that a Pretrial Conference is set for **March 12, 2019, at 2:00 p.m.**  It is further

**ORDERED** that the parties must submit a Joint Discovery/Case Management Plan on or before **March 7, 2019.**

SIGNED at Houston, Texas, this 26<u>th</u> day of **February, 2019.**

NANCY F. ATLAS
SENIOR UNITED STATES DISTRICT JUDGE

P:\ORDERS\11-2018\3546MDism.docx  190226.1557